UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____
CLEAR CHANNEL OUTDOOR, INC.,                )
                                            Plaintiff,

v.

PORT OF SEATTLE,

                                            Defendant.
_____

No. C10-0486RSL

ORDER

This matter comes before the Court on "Clear Channel's Motion for Partial Summary Judgment on Liability" (Dkt. # 22), "Clear Channel's Motion for Partial Summary Judgment re Alleged October 12, 2006, Agreement" (Dkt. # 79), and the "Port of Seattle's Cross Motion for Summary Judgment" (Dkt. # 80). Having reviewed the memoranda, declarations, and exhibits submitted by the parties and having heard the arguments of counsel, the Court finds as follows:

**BACKGROUND**

Plaintiff Clear Channel Outdoor, Inc., leased property in south Seattle where it constructed and/or maintained three billboards. Each lease had an initial fifteen-year term with a ninety-day termination provision. The parties dispute whether the lessor could cancel the lease at any point before the end of the initial fifteen-year term.

In early 2005, defendant Port of Seattle notified Clear Channel that the Port needed to acquire the properties on which the billboards were standing free and clear of Clear Channel's leasehold interests for a road improvement project. The Port offered Clear Channel a total of

ORDER

1   $216,200 in exchange for modifying the original termination provision of the leases. Decl. of
2   John R. McDowall (Dkt. # 36), Exs. 2 and 3. Clear Channel believed the Port's appraisal
3   method was invalid and that the billboards were far more valuable (totalling $3.6 million), but
4   suggested that it might be willing to accept the $216,200 as compensation for its relocation costs
5   if the Port provided alternative sites on which the billboards could be relocated. Decl. of Paul R.
6   Taylor (Dkt. # 99), Ex. 23; Decl. of Gary Wallinder (Dtk. # 37), Ex. 7. The Port declined to
7   offer any other Port-owned properties as replacements, and the parties restarted negotiations
8   with the understanding that relocation on Port property was not an option. Decl. of Gary
9   Wallinder (Dtk. # 37), Ex. 8.

10          During the next three and a half months, the parties attempted to reach a mutually
11  beneficial resolution outside of an eminent domain proceeding. The Port identified non-owned
12  properties that might serve as relocation sites and agreed that the three billboards could stay
13  where they were until the road improvement schedule necessitated their removal. For its part,
14  Clear Channel reduced its demand to $600,000 (then to $550,000), but requested that the Port
15  agree to modify other leases it had with Clear Channel to make them more favorable to plaintiff.
16  Decl. of Paul R. Taylor (Dkt. # 99), Ex. 23. In anticipation of a meeting on October 12, 2006,
17  Clear Channel drafted an "Early Lease Termination Agreement" that summarized the
18  negotiations to that point. Decl. of Jason M. Kettrick (Dkt. # 77), Ex. 3; Decl. of Paul R. Taylor
19  (Dkt. # 99), Ex. 1 at 11. The initial draft did not specify a compensation amount, it required the
20  Port to upgrade certain existing leases, it required Clear Channel to remove the three billboards
21  by the end of 2006, and it was contingent on the approval of the Port of Seattle Commission. At
22  the October 12, 2006, meeting, Clear Channel demanded $500,000 to offset its relocation costs
23  and three Port-owned sites on which to relocate. Decl. of Paul R. Taylor (Dkt. # 99), Ex. 19 at
24  50-54.

25          On October 20, 2006, Clear Channel forwarded a revised Early Lease Termination
26  Agreement to the Port. The revised agreement specified a payment of $500,000 as "full and

complete compensation to Clear Channel for early termination," including "any claims for interest, fees, reimbursements, relocation assistance and any other claims of any nature . . . ." Decl. of Paul R. Taylor (Dkt. # 99), Ex. 3.  The provisions of the draft agreement that required the modification of other Port-held leases and Commission approval were deleted.  Id.  In addition, the date of removal was extended so that Clear Channel could maintain the three billboards until the road improvement project had advanced to the point where removal became necessary.  Id.  The revised agreement was forwarded by Terry Sandblast, Clear Channel's Government Affairs Manager and negotiator, with the following message: "The attached documents reflect the terms that we mutually accepted in our meeting on October 12, 2006.  If your legal counsel has questions regarding the documents, please have him contact [Clear Channel's outside counsel].  Thanks for your assistance."  Id.  According to the contemporaneous record, the Port (through Gary Wallinder) and Clear Channel (through Terry Sandblast) both believed that they had come to an agreement at the October 12th meeting, the terms of which were reflected in the October 20th document.  Id., Ex. 3 and Ex. 1 at 6; Decl. of Gary Wallinder (Dkt. # 37) at ¶ 12.  Although Clear Channel continued to hope that it would be able to negotiate relocation provisions in the future, it understood that the Port wanted to separate the lease termination agreement from any attempts to identify relocation sites or upgrade existing leases, and it was willing to accede to that request.  Decl. of Paul R. Taylor (Dkt. # 99), Ex. 1 at 7-8, 11-13; Ex. 19 at 53.

Neither party signed the Early Lease Termination Agreement.  Pursuant to the agreement, the Port was to make payment in January 2007, but when the Port inquired, it was told that Clear Channel would prefer to defer payment because of tax considerations.  Decl. of Gary Wallinder (Dkt. # 37) at ¶ 14.  In March 2007, a consultant assisting the Port with its acquisition efforts contacted Clear Channel to confirm that "we were dealing with the same understanding now that we were in October."  Decl. of Paul R. Taylor (Dkt. # 99), Ex. 15.  The consultant noted that "Port legal review has yet to take place" and that "there may be some time

frame changes in the Exhibit A." Id. Clear Channel confirmed that the parties' understanding was as stated in the Early Lease Termination Agreement. Id. The Port then proceeded with the purchase of the properties on which the three billboards were located. Decl. of Gary Wallinder (Dkt. # 37), Exs. 10 and 11. Because it believed that the leasehold issues had been resolved, the Port acquired the properties without initiating eminent domain proceedings. Id. at ¶ 13.

Between the date of the agreement and mid-2009, the Port provided Clear Channel with updates regarding the road improvement project and how it would impact the timing of the removal of the three billboards. In July 2007, Terry Sandblast passed the following message on to the President of Clear Channel, Olivia Voigt: "I just spoke to Gary Wallinder. He was up beat and re-iterated that he is disposed to leave us there as long as possible, perhaps another year, and that he has received an appraisal that allows him to justify our previous agreement of $500 K. Thanked him and told him that we would be patient." Decl. of Jason M. Kettrick (Dkt. # 77), Ex. 5. Ms. Voigt's response was, "Great news. Thanks." Id. In March 2008, the Port reminded Clear Channel that the parties' relationship had been converted to a month-to-month lease and noted that a delay in utility relocations in the area meant that the billboards could stay until at least the end of 2008. The Port committed to "leaving the billboards in place as long as construction activities allow" and reiterated its obligation to pay Clear Channel $500,000 when removals were required. Id., Ex. 13.

The Port apparently maintains a database regarding its agreements with third parties. Sometime before August 28, 2009, an entry was made regarding "AGRMT #: 001015" which suggests that an agreement regarding removal of at least one of the billboards at issue in this litigation had not yet been reached. Decl. of Paul R. Taylor (Dkt. # 99), Ex. 10 ("Gary W. (Project Manager) is pending negotiations for buy out"). Clear Channel has submitted two other documents that purportedly show that no agreement was reached between the Port and Clear Channel. Decl. of Paul R. Taylor (Dkt. # 99), Exs. 14 and 17. It is not clear what these documents are, when they were created, or the basis for the information contained therein. In its

memorandum, Clear Channel asserts that the documents were created by a consultant involved in the acquisition of property for the road improvement project. Assuming that to be true, that consultant, Kathi Thompson, has stated that her involvement with the Clear Channel negotiations essentially ended after Clear Channel confirmed the agreement on October 20, 2006, and that her use of the term "draft agreement" reflected the fact that the agreement was unsigned. Id., Ex. 13 at 8 and 10; Ex. 23 at 5.

In October 2009, the Port notified Clear Channel that one of the billboards would have to come down within sixty days. Decl. of Gary Wallinder (Dkt. # 37) at ¶ 16. Clear Channel responded by requesting a copy of the agreement which authorized early termination and noting that construction costs had increased over the years such that "we need to revisit where the numbers are in relativity to actual costs." Decl. of Paul R. Taylor (Dkt. # 99), Ex. 5. The Port conceded that a signed agreement did not exist and forwarded a copy of the October 20, 2006, unsigned Early Lease Termination Agreement with the suggestion that the parties proceed on that basis. Id., Ex. 7. Clear Channel was not willing to do so and took the position that $500,000 was unreasonable in the absence of a relocation agreement. Id., Ex. 6.

On December 1, 2009, the Port provided written notice of termination for all three leases and provided a check in the amount of $500,000, citing the October 2006 agreement as authority. Id., Ex. 2. Without explanation or even acknowledgment, the version of the Early Lease Termination Agreement attached to the termination letter was altered to include an effective date of December 1, 2009, to reflect the completed purchase of the underlying real properties, and to delete the payment due date of February 1, 2007. Clear Channel responded by filing this lawsuit and asserting a takings claim under the Fifth Amendment of the United States Constitution, a due process claim under the Fourteenth Amendment, and a breach of contract claim.

## DISCUSSION

Pending before the Court are three motions for summary judgment. Clear Channel's first motion (Dkt. # 22) is based on the argument that the Port breached the original lease agreements between the parties when it attempted to terminate the leases during the initial fifteen-year term. In response, the Port argues that the original lease agreements were superceded by the October 2006 Early Lease Termination Agreement, such that an interpretation of the original leases is unnecessary. The Court agrees that if the Early Lease Termination Agreement is enforceable, the Court need not interpret the termination provisions of the original leases. Both parties have filed summary judgment motions regarding the enforceability of the October 2006 agreement (Dkt. # 79 and # 80).

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact that would preclude the entry of judgment as a matter of law. Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000). The party seeking summary dismissal of the case "bears the initial responsibility of informing the district court of the basis for its motion" (Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)) and identifying those portions of the materials in the record that show the absence of a genuine issue of material fact (Fed. R. Civ. P. 56(c)(1)). Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to designate "specific facts showing that there is a genuine issue for trial." Celotex Corp., 477 U.S. at 324. "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient:" the opposing party must present probative evidence in support of its claim or defense. Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 919 (9th Cir. 2001); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991). In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor." Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995).

Having reviewed the memoranda, declarations, and exhibits submitted by the parties and taking the evidence in the light most favorable to Clear Channel, the Court finds as follows:

**I. BREACH OF CONTRACT**

Under Washington law, a contract exists if there is a meeting of the minds on the essential terms of the agreement. McEachern v. Sherwood & Roberts, Inc., 36 Wn. App. 576, 579 (1984). While a meeting of the minds is often evidenced by an offer and acceptance, the key consideration is whether the parties manifested to each other their mutual assent to the same bargain at the same time. Pac. Cascade Corp. v. Nimmer, 25 Wn. App. 552, 556 (1980). The burden of proving the existence of a contract is on the party asserting its existence. Cahn v. Foster & Marshall, Inc., 33 Wn. App. 838, 840 (1983).

When determining the intent of the parties, including whether the parties intended to create a binding agreement at the time of contracting, the Court adheres to the objective manifestation theory. Under this theory, the Court imputes to each party "an intention corresponding to the reasonable meaning of his words and acts. Unexpressed intentions are nugatory when the problem is to ascertain the legal relations, if any, between two parties." Morris v. Maks, 69 Wn. App. 865, 871-72 (1993) (quoting Plumbing Shop, Inc. v. Pitts, 67 Wn.2d 514, 517 (1965)). Although the presence of mutual assent is usually a question of fact, summary judgment is appropriate where the evidence in the record, viewed in the light most favorable to the non-moving party, would allow the jury to reach but one conclusion on the issue. Keystone Land & Dev. Co. v. Xerox Corp., 353 F.3d 1070, 1073 (9th Cir. 2003).

The evidence in this case leads to the conclusion that the parties agreed to the terms set forth in the Early Lease Termination Agreement on or about October 12, 2006, that a written agreement memorializing those terms was exchanged on October 20, 2006, and that the parties intended to be bound by their agreement. The parties had been engaged in substantive negotiations regarding the termination of the three billboard leases for a number of months.

Various proposals and counter proposals had been considered, and each party understood the other's motivations and limitations. Clear Channel arrived at the October 12, 2006, meeting with a proposed agreement in hand and reasserted its demand for a cash payment plus three Port-owned relocation sites. Both parties compromised their positions: Clear Channel was forced to concede the relocation issue, and the Port ended up paying twice as much as it had originally offered while allowing Clear Channel to maintain the billboards until construction forced their removal. Clear Channel revised the draft agreement to reflect the terms that had been, by Clear Channel's own acknowledgment, "mutually accepted" by the parties. The revised agreement expressly stated that the $500,000 payment was "full and complete compensation to Clear Channel for early termination of Clear Channel's leasehold and property rights . . . ." Decl. of Paul R. Taylor (Dkt. # 99), Ex. 3.

The parties' post-contracting actions confirm that they intended to be bound by the terms of the October 2006 Early Lease Termination Agreement. With the exception of extensions of the dates by which the billboards would have to be removed and payment made, no further refinements or alterations were made to the October 2006 agreement for over three years. Clear Channel has not identified any subsequent negotiations regarding the basic terms of the agreement or the designation of relocation sites. The communications between the parties consistently refer to the October 2006 agreement and/or rely upon it for the proposition that the leases are terminable upon notice and payment of $500,000. If, as Clear Channel now argues, an early termination agreement had not been reached, the original fifteen-year term would have been in place, and Clear Channel would have expressed confusion or disagreement, rather than excitement, when Mr. Wallinder informed them that the billboards could remain in place until the end of 2008 or 2009. At no point between the "mutual acceptance" of the Early Lease Termination Agreement in October 2006 and October 2009 did Clear Channel indicate that it believed the agreement to remove the billboards in exchange for $500,000 was subject to renegotiation at the time of removal and/or was contingent on the provision of suitable relocation

sites.

The fact that the Early Lease Termination Agreement was unsigned is not dispositive on the issue of mutual assent. All relevant terms of the agreement were negotiated and memorialized by the parties, and both sides accepted those terms. See Morris, 69 Wn. App. at 869 (informal writings are sufficient to establish a contract where (1) the subject matter has been agreed upon, (2) the terms are all stated in the writings, and (3) the parties intended a binding agreement at the alleged time of contracting). Contrary to Clear Channel's current position, the Early Lease Termination Agreement, as negotiated at the October 12th meeting and memorialized by Clear Channel a week later, is not contingent on a separate agreement regarding relocation sites. This issue was negotiated in the months leading up to the October 12, 2006, meeting, was raised at the meeting, and was resolved as stated in the mutually accepted version of the agreement. Clear Channel expressly agreed that the $500,000 "shall constitute full and complete compensation to Clear Channel for early termination" and "shall include any claims for interest, fees, reimbursements, relocation assistance and any other claims of any nature . . . ." Even if the Court were to assume that Terry Sandblast and/or Olivia Voigt intended Clear Channel's acceptance of the termination agreement to be contingent on the later negotiation of a relocation or lease extension agreement, their objective acts and words indicated assent to the terms as written. Under Washington law, their unexpressed contingency cannot impact the legal relationship between the parties.

Clear Channel's reliance on internal Port databases, project management tools, and/or the November 30, 2009, Port of Seattle Commission action is misplaced. First, these charts and actions appear to be based on a misunderstanding of governing law: the fact that the Early Lease Termination Agreement was unsigned does not mean that it was not "final" and enforceable. More importantly, these documents and events cannot alter the objective indications of mutual assent manifested by the parties at the time of contracting. The early removal of the three billboards in exchange for $500,000 was "mutually accepted" by the parties

at their October 12, 2006, meeting and was confirmed in a written document on October 20, 2006. In relation to each other, the parties consistently conducted themselves as if the Early Lease Termination Agreement governed. It was not until the date of removal loomed and Clear Channel realized that the parties had never signed the agreement that either party took a position inconsistent with their previous understanding.[1]

## II. AUTHORITY TO ACT

In its second motion for partial summary judgment, Clear Channel contends that the Early Lease Termination Agreement is unenforceable because Gary Wallinder, the lead negotiator for the Port, needed Commission approval to enter into an agreement where the $500,000 payment for the leaseholds exceeded the Port's appraisal by more than 10%. Under Washington law, acts performed with no legal authority are void because no power to act or contract existed. S. Tacoma Way, LLC v. Washington, 169 Wn.2d 118, 123 (2010). Such is not the case here. Pursuant to Port of Seattle Commission Resolution No. 3181, Article IV, Mr. Wallinder had authority to negotiate and enter into agreements for the East Marginal Way Grade Separation Project on a project-wide basis. Decl. of Patricia Davis (Dkt. # 93), Exs. A and B. Clear Channel does not contest Mr. Wallinder's authority to contract in the circumstances presented here: it simply contends that he should have obtained Commission approval before contracting. Even if the Court assumes that Mr. Wallinder failed to comply with the Port's master policy directive on the delegation of authority to the Executive Director, a failure to follow procedural requirements does not render the contract void. S. Tacoma Way, LLC, 169

---

[1] Because the Commission's November 30, 2009, actions (or inactions) are not relevant to determining the intent of the parties at the time of contracting, the discovery abuses alleged in Clear Channel's "Motion to (i) Bar Port from Offering Evidence About the ELTA at Trial, (ii) Determine Waiver of the Attorney-Client Privilege, (iii) Compel the Deposition of Joe McWilliams, and (iv) Award Sanctions" (Dkt. # 113) relate to a wholly collateral issue that does not alter the outcome of this case. While the evidence in the record suggests that all counsel should revisit their witness-handling protocols so that declarations are not signed on less than personal knowledge or without proper consideration, the relief sought by plaintiff is unnecessary at this stage of the litigation.

Wn.2d at 122-24. Because Mr. Wallinder was generally authorized to negotiate and enter into agreements related to the road improvement project, he did not exceed his power to act. Nor did any procedural failure to seek approval contravene the purposes behind the approval requirement: no argument has been presented that Mr. Wallinder overpaid for the right to terminate the leases upon notice or that taxpayer funds were wasted. See id. at 124. The Court finds that the alleged violation of Resolution No. 3181 does not render the Early Lease Termination Agreement illegal or unenforceable.

Nor has Clear Channel established its underlying premise that Mr. Wallinder violated Resolution No. 3181. Where real property was to be acquired or disposed, Mr. Wallinder was authorized to obtain an appraisal for use in evaluating and negotiating the transfer of the real property "or any lesser interest therein." Decl. of Patricia Davis (Dkt. # 93, Ex. A, Article III(A). In furtherance of his power to acquire real property, Mr. Wallinder was required to:

> take all necessary steps, including executing all required closing documents, to secure title of such property for the Port. The acquisition price of individual properties (or ownership's) [sic] shall in no case exceed the Port's appraisal by more than ten percent (10%) without further specific Commission approval. When several parcels are authorized for purchase by the Port Commission, the total price paid for all such properties shall not exceed the Port's appraisal by more than ten percent (10%) without further specific Commission approval.

Id., Article III(B).

The Commission authorized Mr. Wallinder to negotiate and purchase all of the properties in the East Marginal Way right-of-way: as far as the record shows, no properties were individually authorized for purchase. Id., Ex. C at 6. If, as the nature of the authorization suggests, the last sentence of Article III(B) of Resolution 3181 governs, Clear Channel has failed to provide evidence of a project-wide appraisal that was exceeded by more than 10%.[2] The Port

---

[2] To the extent Clear Channel is relying on the individual appraisals the Port obtained for the leaseholds prior to the October 2006 agreement, those appraisals were based on the value of the

maintains that Mr. Wallinder was acting within the scope of his designated authority when he agreed to pay more than two times the appraised value of the leaseholds, arguing that the expenditure of money to clear encumbrances from the right-of-way is not the "acquisition of real property." As a matter of regulatory interpretation, this argument is debatable, but it is not unreasonable. Both Mr. Wallinder and Commissioner Davis construe Resolution 3181 to give Mr. Wallinder discretion in determining the appropriate amount to pay to modify lease terms and clear encumbrances from land otherwise acquired. Id. at ¶¶ 7 and 9; Decl. of Gary Wallinder (Dkt. # 94) at ¶ 6. Clear Channel has not provided sufficient justification for the Court to reject the Port's interpretation of its own resolution. Port of Seattle v. Pollution Control Hearing Bd., 151 Wn.2d 568, 593 (2004).

### III. PROMISSORY ESTOPPEL

Assuming, for purposes of this motion, that there is a genuine issue of material fact regarding the parties' mutual acceptance of the terms of the Early Lease Termination Agreement or the Port's authority to contract in October 2006, Clear Channel is estopped from repudiating the agreement at this point. Promissory estoppel applies when (1) a promise was made which (2) plaintiff should reasonably have expected would cause defendant to change its position and (3) which did in fact cause defendant to change its position (4) in justifiable reliance on the promise and (5) in such a manner that injustice can be avoided only by enforcing the promise. King v. Riveland, 125 Wn.2d 500, 506 (1994). On at least two occasions, Clear Channel assented to the terms of the Early Lease Termination Agreement, including its release from all claims of any nature arising out of the leaseholds, without any indication that the agreement was contingent on a separate deal regarding relocation sites. Clear Channel understood that the Port was seeking to remove all leasehold interests and other impediments to the title of the underlying

---

improvements (as measured by the cost of the billboards and installation). Because the selection of compensable factors was restricted by an outside funding source, it is not clear whether those appraisals were "appropriate appraisals" under Article III(A).

ORDER                                      -12-

properties and that it could either negotiate a resolution with the Port or take its chances in an eminent domain proceeding. When it agreed to remove the billboards in exchange for $500,000, Clear Channel knew that its promise would impact the Port's behavior. Based on Clear Channel's October 20, 2006, promise and the March 2007 confirmation of the parties' agreement, the Port went ahead and acquired the underlying properties outside of eminent domain proceedings. Because an expeditious and flexible removal procedure had been agreed upon, the Port also allowed the billboards to remain standing for as long as possible given the needs of the construction project.

Over the course of three years, Clear Channel received a number of communications from the Port summarizing the agreement of the parties and indicating that the leases were terminable upon notice and the tender of $500,000. Clear Channel failed to contradict or correct the Port's understanding of the parties' agreement until the eve of this litigation. The Port justifiably relied on Clear Channel's promise and subsequent silence by leaving the billboards undisturbed until they became an impediment to the road improvement project. Unless Clear Channel is estopped from disavowing its promise to remove the billboards upon notice and payment of $500,000, the Port will be forced to initiate eminent domain proceedings or restart negotiations to resolve the leasehold issues even as the construction activities are proceeding. Given the entire course of the negotiations and subsequent conduct of the parties, an injustice would occur if Clear Channel could, at this late date, hold the construction project hostage simply because the parties failed to sign the Early Lease Termination Agreement. Clear Channel's promise that the billboards would come down upon notice and the tender of $500,000 will therefore be enforced. See Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wn.2d 1, 19 (2002).

## CONCLUSION

For all of the foregoing reasons, the Court finds that the Port of Seattle and Clear Channel Outdoor, Inc., entered into a binding contract on October 12, 2006, as memorialized in

1  the Early Lease Termination Agreement drafted by Clear Channel and forwarded to the Port on
2  October 20, 2006.  In the alternative, Clear Channel is estopped from repudiating its obligations
3  under the Early Lease Termination Agreement.  The Port's "Cross Motion for Summary
4  Judgment" (Dkt. # 80) is hereby GRANTED.  Because the October 2006 agreement modified
5  the termination provisions of the original billboard leases, Clear Channel's "Motion for Partial
6  Summary Judgment on Liability" (Dkt. # 22) is DENIED.  Clear Channel's "Motion for Partial
7  Summary Judgment re Alleged October 12, 2006 Agreement" (Dkt. # 79) and "Motion to (i) Bar
8  Port from Offering Evidence About the ELTA at Trial, (ii) Determine Waiver of the Attorney-
9  Client Privilege, (iii) Compel the Deposition of Joe McWilliams, and (iv) Award Sanctions"
10 (Dkt. # 113) are also DENIED.

          Dated this 13th day of December, 2010.

                    /s/ Robert S. Lasnik
                    _____
                    Robert S. Lasnik
                    United States District Judge